**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | | |
|---|---|---|
| A.A., | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | Case No. 4:24-cv-191-CDL-AGH |
| | : | 28 U.S.C. § 2241 |
| Warden, STEWART DETENTION | : | |
| CENTER, *et al.*, | : | |
| | : | |
| Respondents. | : | |

## <u>REPORT AND RECOMMENDATION</u>

Petitioner filed an application for a writ of habeas corpus seeking release from custody based on his prolonged pre-final order detention. As explained below, the Court recommends granting Petitioner's request for a bond hearing. However, it is further recommended that Respondents' motion to dismiss portions of Petitioner's application be granted.

## BACKGROUND

Petitioner is a native and citizen of Kyrgyzstan who sought admission to the United States on November 3, 2023, for purposes of requesting asylum. Pet. ¶¶ 1, 16, ECF No. 1; Gloster Decl. ¶ 4, ECF No. 8-1; Gloster Attach A, at 1-2, ECF No. 8-2. Immigration Customs and Enforcement ("ICE"), Enforcement Removal Operations ("ERO") detained Petitioner on his date of entry and then provided him with a Credible Fear Interview ("CFI") on December 29, 2023. Pet. ¶¶ 1, 16; Gloster Decl. ¶ 5; Gloster Attach. A, at 2. Petitioner claimed that he was a civil servant and politician

who feared retaliation from corrupt Parliament members, State Committee for National Security officials, local law enforcement, and those organizations' associates. Pet. ¶ 15. On January 2, ICE/ERO determined that Petitioner had a credible fear of torture. *Id.* ¶ 16. Petitioner then submitted a parole request on January 22, 2024, which was denied. Gloster Decl. ¶ 6.

The Department of Homeland Security ("DHS") served Petitioner with a Notice to Appear ("NTA") in removal proceedings on February 14, 2024, charging him with being an "arriving alien" who was removable under 8 U.S.C. § 1182(a)(7)(A)(i)(I) as an immigrant who, at the time of application for admission, lacked valid entry documents. Pet. ¶ 17; Gloster Decl. ¶ 7; Gloster Attach. C, at 1, ECF No. 8-4. On February 19, 2024, Petitioner was transferred to Stewart Detention Center ("SDC") in Lumpkin, Georgia. Pet. ¶ 17; Gloster Decl. ¶ 7. Petitioner submitted a custody redetermination request to ICE/ERO on March 7, 2024, which was denied on March 11, 2024. Gloster Decl. ¶ 8.

Petitioner appeared before an immigration judge ("IJ") for a master hearing calendar on March 21, 2024, but the hearing was rescheduled due to there being no interpreter. Pet. ¶ 18; Gloster Decl. ¶ 9. Petitioner appeared for a hearing again on April 2, 2024, but it had to be rescheduled because the Kyrgyz interpreter cancelled on short notice. Pet. ¶ 18; Gloster Decl. ¶ 10. At Petitioner's rescheduled hearing on April 9, 2024, the IJ granted Petitioner a continuance to retain counsel. Pet. ¶ 18; Gloster Decl. ¶ 11. Petitioner's counsel Harum Taskin entered an appearance on April 13, 2024. Pet. ¶ 18; Gloster Decl. ¶ 12.

Petitioner unsuccessfully sought release on parole several times through counsel. First, Petitioner submitted a parole request on April 19, 2024, that ICE subsequently denied on May 9, 2024, with the Deportation Officer's email response stating simply that Petitioner did not qualify for parole.[1] Pet. ¶ 19; Pet. Attach. D, at 7, ECF No. 1-10. Petitioner then submitted an updated parole request on May 14, 2024. Pet. ¶ 19; Pet. Attach. D, at 6. Therein, Petitioner noted his declining health conditions, his submission of an I-589 form for asylum, and his strong ties to a sponsor. *Id.* During Petitioner's May 17, 2024 master calendar hearing, Petitioner conceded to the allegations and charges alleged in the NTA, and the IJ informed Petitioner that he would be released on parole. Pet. ¶ 20. However, the IJ was relying on false information mistakenly supplied by ICE/ERO. *Id.* ¶ 21. According to ICE/ERO, an agent erroneously entered a change of address form indicating that Petitioner had been released on parole. Pet. ¶ 21; Gloster Decl. ¶17. ICE/ERO corrected its mistake and denied Petitioner's second parole request on May 20, 2024, because ICE/ERO determined that Petitioner was a flight risk and threat to security. Gloster Decl. ¶ 13. Petitioner then sought reconsideration on May 21, 2024, and submitted another parole request on June 10, 2024, that included further health considerations for Petitioner. Pet. ¶ 21; Pet. Attach. D, at 2. Petitioner then

---

[1] To protest his detention, Petitioner began a hunger strike on April 25, 2024. Pet. ¶ 23; Gloster Decl. ¶ 14. On May 3, 2024, the Court issued an order authorizing lab tests, evaluations, and intravenous administration of fluids until Petitioner ended his hunger strike. Gloster Decl. ¶ 14. On May 7, 2024, ICE transferred Petitioner to Folkston Processing Center to receive a force-feeding procedure, but he ended his hunger strike on the same day. Pet. ¶ 23; Gloster Decl. ¶15. Petitioner alleges that he agreed to resume eating only after "ICE officers lied to him and told him that he would be released from detention if he ended his hunger strike." Pet. ¶ 23. ICE returned Petitioner to SDC on May 13, 2024. *Id.* ¶¶ 15-16.

submitted four follow up requests between July 10, 2024, and September 4, 2024, which were denied.  Gloster Decl. ¶¶ 19-20.

Petitioner attended another master calendar hearing on June 6, 2024, wherein the IJ sustained Petitioner's NTA and scheduled a merits hearing for September 3, 2024.  *Id.* ¶ 18.  However, the merits hearing was rescheduled twice: once to December 19, 2024, following a scheduling mishap, and again to April 10, 2025, as the result of an internet outage.  Pet. ¶ 22; Gloster Decl. ¶¶ 21-22.

Petitioner filed a petition for writ of habeas corpus on December 18, 2024, alleging that he is being unlawfully detained without parole or an individualized bond hearing before an IJ.  Pet. ¶¶ 1-4.  Further, Petitioner argues that Respondents are failing to comply with their own binding procedural directive to parole noncitizens found to have a credible fear of persecution or torture.  *Id.* ¶ 2.  Respondents counter that Petitioner's claims are not cognizable in habeas, or, in the alternative, that the Court lacks jurisdiction to review ICE/ERO's discretionary parole determinations. Resp'ts' Resp. 5-30, ECF No. 8.

On January 14, 2025, ICE/ERO personally served Petitioner with a Parole Advisal and Scheduling Notification as part of ICE/ERO's review of his parole request pursuant to 8 U.S.C. § 1182(d)(5)(A).  2d Gloster Decl. ¶ 4, ECF No. 15-1; 2d Gloster Attach. A, ECF No. 15-2.  Petitioner completed his parole interview on January 21, 2025. 2d Gloster Decl. ¶ 6; 2d Gloster Attach. B, ECF No. 15-3.  ICE/ERO considered documentary evidence submitted by Petitioner's counsel in addition to Petitioner's interview when assessing whether Petitioner should be paroled.  2d Gloster Decl. ¶ 7.

ICE/ERO ultimately denied Petitioner's request on the basis that "he had not established that he was not a danger to the community or U.S. Security." Resp'ts' Mot. Dismiss 2, ECF No. 15; 2d Gloster Decl. ¶ 7; 2d Gloster Attach. A, at 2.

Following Petitioner's hearing, Respondents moved to dismiss Counts II and III of the Petition, arguing that Petitioner's parole hearing was the appropriate remedy to address the alleged harm, thus rendering the allegations moot. Resp'ts' Mot. Dismiss 2-5. Petitioner opposes Respondents' motion, arguing that although they provided Petitioner with a parole hearing, they still have not fully complied with their procedural requirements. *Id.* at 1.

On May 23, 2025, Petitioner had an individualized merits hearing on his applications for relief from removal before an IJ, wherein the IJ heard the parties' testimony and directed the parties to file written closings by May 30, 2025. Pet.'s Notice 1, ECF No. 19; Gonzales Decl. ¶ 7, ECF No 22-1. On July 1, 2025, the IJ denied Petitioner's application for relief from removal and ordered him removed to Kyrgyzstan. IJ Order 1, ECF No. 19-1. Petitioner then timely appealed the IJ's removal order to the Board of Immigration Appeals ("BIA"). Filing Receipt 1, ECF No. 19-2. The parties completed briefing on October 28, 2025, and the appeal remains pending. Pet.'s Status Report 1, ECF No. 21; Gonzales Decl. ¶ 9.

Petitioner's petition for writ of habeas corpus (ECF No. 1) and Respondents' motion to dismiss (ECF No. 15) are ripe for review.

## DISCUSSION

Petitioner asserts two categories of claims in his application for habeas relief. First, Petitioner claims that his continued detention without a bond hearing violates the Fifth Amendment Due Process Clause. Pet. ¶¶ 77-81. Second, Petitioner claims that Respondents failed to comply with an internal parole directive in violation of due process and the Administrative Procedures Act ("APA"). *Id.* ¶¶ 82-86. Respondents move to dismiss Petitioner's claims in the second category. Resp'ts' Mot. to Dismiss, ECF No. 15. As explained below, it is recommended that Petitioner's application for habeas relief be granted in that he be given a bond hearing within seven days of an order adopting this recommendation. It is further recommended that Respondents' motion to dismiss be granted.

## I. Prolonged Detention Under 8 U.S.C. § 1225(b)

Since *Jennings v. Rodriguez*, 583 U.S. 281 (2018), this Court, like other courts, has struggled with question of whether prolonged detention of arriving aliens without a bond hearing violates due process. There are few directly relevant decisions from courts in this Circuit, and none from the Eleventh Circuit or other circuit courts. Until recently, this Court recognized that arriving aliens have at least some level of due process rights against unreasonable detention. *See, e.g., L.K. v. Dep't of Homeland Sec*, No. 7:19-cv-16-WLS-MSH, R. & R. 11 (M.D. Ga. Jan. 24, 2020), ECF No. 22 ("The Court agrees that arriving aliens, such as [p]etitioner, have at least some base level of due process rights against unreasonable detention."), *recommendation adopted by* Order 1-5 (M.D. Ga. Mar. 27, 2020), ECF No. 26; *D.A.F. v. Warden,*

*Stewart Det. Center*, No. 4:20-cv-79-CDL-MSH, R. & R. (M.D. Ga. May 8, 2020), ECF No. 11 (same), *recommendation adopted in part by* Order 1-4, (M.D. Ga. July 24, 2020), ECF No. 15.  But in 2020, the Court issued an Order and Recommendation in which it found, based on the Supreme Court's decision in *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020), "that arriving aliens' procedural due process rights entitle them only to the relief provided by the INA[]" and thus, a "[p]etitioner may only seek relief from detention under the parole procedure set forth in 8 U.S.C. § 1182(d)(5)(A)." *A.M.Y. v. Warden,* No. 7:20-cv-61, Order & R. 36, 37, ECF No. 47 (M.D. Ga. Oct. 13, 2020), *recommendation adopted by* Order 1, (M.D. Ga. Nov. 4, 2020), ECF No. 49; *see also D.A.V.V. v. Warden*, No. 7:20-cv-159, 2020 WL 13240240, *4-6 (M.D. Ga. Dec. 7, 2020).  The Court revisits its prior decisions, finds that they improperly expanded the holding in *Thuraissigiam*, and holds that Petitioner is entitled to a bond hearing in this case.

     A.    <u>Section 1225(b) and Detention Standards</u>

An "applicant for admission coming or attempting to come into the United States at a port-of-entry" is an "arriving alien."  8 C.F.R. § 1001.1(q).  Arriving aliens found to be inadmissible under certain provisions of the INA can be processed for removal through the expedited removal process outlined at 8 U.S.C. § 1225(b)(1).  *See also* 8 C.F.R. § 235.3.  Under § 1225(b)(1), arriving aliens in expedited removal proceedings are subject to mandatory detention, even if found to have a credible fear of persecution.  8 C.F.R. § 235.3(b)(2)(iii); 8 U.S.C. § 1225(b)(1)(B)(ii), (iii)(IV); *Jennings*, 138 S.Ct. at 842 (finding the "clear language" of section 1225(b)(1)

7

mandates detention of aliens claiming a credible fear of persecution).   The only exception to this mandatory detention requirement is discretionary parole.  8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. §§ 235.3(b)(2)(iii); 212.5; *see also* ICE Directive 1002.1, Parole of Arriving Aliens Found to have a Credible Fear of Persecution or Torture (Dec. 8, 2009).

The Supreme Court previously held that the Fifth Amendment prohibits potentially indefinite post-final order detention under 8 U.S.C. § 1231.  In *Zadyvdas v. Davis*, the Court recognized that "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem."  533 U.S. 678, 690 (2001).  To solve this constitutional problem, the Court applied the doctrine of constitutional avoidance and read a reasonableness requirement into the post-final order detention statute, 8 U.S.C. § 1231.  *Id.* at 689, 699-700.  The Supreme Court held that § 1231(a)(6) authorizes post-removal-order detention only for a period "reasonably necessary" to accomplish the alien's removal from the United States.  *Id.* at 699-700. The Court recognized six months as a presumptively reasonable period of time to allow the government to accomplish such removal.  *Id.* at 701.

But in *Jennings v. Rodriguez*, the Supreme Court explicitly declined to apply the canon of constitutional avoidance to read a similar six-month limit on detention into § 1225(b).  *Jennings*, 583 U.S. at 296-301.  Instead, the Court concluded that the statute mandated detention until "the completion of applicable proceedings."  *Id.* at 302.  Nevertheless, the Court left open whether prolonged detention of arriving aliens

8

without a bond hearing would violate the Due Process Clause of the Fifth Amendment. *Id.* at 312.

>    B.    Arriving Aliens' Due Process Rights

As stated above, Respondents claim that an arriving alien's due process rights are limited to what is provided by Congress via statue. Under Respondents' theory, a review of the statute which requires mandatory detention (without review) would be the end of this case. The Court declines to find that Petitioner's due process rights are so limited. While the Court agrees that an arriving aliens' due process rights to entry or admission are limited to what is provided by statute, the Court disagrees that this limitation applies to the issue raised by Petitioner here—prolonged mandatory detention without a bond hearing. Thus, Petitioner can assert a claim to a bond hearing for alleged prolonged detention.

>    1.    *Arriving aliens' due process rights in seeking admission are limited.*

"Our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality." *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958). "In the later instance the [Supreme] Court has recognized additional rights and privileges not extended to those in the former category who are merely on the threshold of initial entry." *Id.* (internal quotation marks and citation omitted). This "distinction" between non-citizens present in the United States and non-citizens stopped at the border permeates the corpus of immigration caselaw. *Zadvydas v. Davis*, 533 U.S. 678, 692 (2001).

9

Respondents cite to these and other immigration cases to show that Petitioner has essentially no due process rights regarding his detention. Resp'ts' Resp. 8-9. Specifically, Respondents contend that "the due process rights of arriving aliens seeking admission into the United States . . . are limited to only the procedure provided by statute." *Id.* at 8. And, here, the statue provides for mandatory detention without an opportunity for review. 8 U.S.C. § 1225(b)(1)(B)(ii), (iii)(IV); 8 C.F.R. § 235.3(b)(2)(iii). But Respondents misstate the holdings of these cases in an important way. The cases cited by Respondent arise in the context of an individual challenging *admission*, not detention; thus, in those decisions the Supreme Court is discussing the executive's power in controlling admission to the United States and an individual's limited due process rights in connection with that admission. *See, e.g., Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative."); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (explaining that the Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute"); *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953);[2] *United States ex rel. Knauff v. Shaughnessy*, 338 U.S.

---

[2] At first blush, *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), would appear to be on point. But in *Mezei*, the Court reviewed a decision by the district court to temporarily *admit* a non-citizen to allow him to arrange to depart the United States. 345 U.S. at 207-08. Mezei claimed that his exclusion without a hearing violated due process because he remained confined on Ellis Island and could not depart to any other country because no other country would take him. He consequently filed a petition for a writ of habeas corpus to challenge his exclusion and continued confinement on Ellis Island. *Id.* at 209-10. Under the prior immigration laws and statutes, a writ of habeas corpus was the appropriate vehicle to judicially challenge an order of exclusion or deportation. The Court "recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the

10

537 (1950) (discussing rights of non-citizen in the context of her request for admission to the United States); *Nishimura Ekiu v. United States*, 142 U.S. 651 (1892) (same). And, as this Court has repeatedly recognized, the Executive does have wide discretion to admit or exclude non-citizens from the United States. *See Thuraissigiam*, 591 U.S. at 139. But those cases do not stand for the broad proposition for which Respondents cite to them—that all of an arriving alien's due process rights are so limited that an arriving alien can never challenge his prolonged mandatory detention.

> 2.    Thuraissigiam *did not expand this rule to issues of detention.*

*Thuraissigiam* follows the precedent listed above and similarly arises in the context of an arriving alien contesting the process provided for *admission*. 591 U.S. at 107. But, as explained below, *Thuraissigiam* explicitly fails to address the due process rights of arriving aliens contesting prolonged detention. The Court

---

Government's political departments largely immune from judicial control." *Id.* at 211. And in the context of discussing exclusion, not detention, explained that "an alien on the threshold of initial entry stands on a different footing [than those present in the United States]: 'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" *Id.* (quoting *Knauff*, 338 U.S. at 544)). The Court then addressed Mezei's "continued exclusion on Ellis Island" and found that such continued exclusion did not "deprive him of any statutory or constitutional right." *Id.* at 215. The Court distinguished Mezei's continued detention without bond based on the fact that his exclusion was "grounded on danger to the national security" and necessarily presented "different considerations" than the normal non-citizen subjected to detention "pending consummation of deportation proceedings". *Id.* at 215-16. The immigration procedures allowed and reviewed in *Mezei* are fundamentally different than those under the INA. Admittedly, the Supreme Court distinguished *Mezei* in *Zadvydas* by noting that Mezei had not entered the territory of the United States in order for certain rights to attach. *Zadvydas*, 533 U.S. at 694. However, the Supreme Court in *Thuraissigiam* later noted the limited value that cases from the era of *Mezei* can have on the interpretation of current statues because of the gross difference in the immigration statues themselves. *See* 591 U.S. at 128-136 (in the context of evaluating the habeas statute and the Suspension Clause, discussing "finality era" cases and the scope of the statute then in effect). Additionally, after *Zadvydas*, the Supreme Court found that enemy combatants detained in Guantanamo had some measure of constitutional right to habeas corpus regarding their potentially indefinite detention, despite the fact that those individuals had never resided in the United States. *See generally Boumedine v. Bush*, 553 U.S. 723 (2008); *see also Leke v. Hott*, 521 F. Supp. 3d 597, 604 (E.D. Va. 2021) ("[I]t is noteworthy that the Supreme Court's recent decisions affording Guantanamo Bay detainees the right to judicial review of detention arguably abrogates the rationale of *Mezei*.").

consequently declines to adopt its prior rulings in *A.M.Y.* and *D.A.V.V.*, which unreasonably expanded the holding of *Thuraissigiam*.

The facts of *Thuraissigiam* are as follows. Thuraissigiam entered the United States without permission, was stopped near the border and was placed in expedited removal proceedings. 591 U.S. at 114. He claimed fear and received a credible fear interview with an asylum officer. *Id.* Although the asylum officer found Thuraissigiam to be credible, the officer found that he failed to demonstrate a credible fear of persecution. *Id.* Thuraissigiam then received review of this decision by a supervising officer and an IJ who both agreed with the asylum officer that Thuraissigiam lacked fear. *Id.* Consequently, he was referred for removal under his expedited removal order. *Id.*

Thuraissigiam then filed a federal habeas application claiming that immigration authorities wrongfully denied his asylum claim. *Thuraissigiam*, 591 U.S. at 114. In his application for habeas relief, he objected to the decisions made by the asylum officer and argued that he had no "meaningful opportunity to establish his claims[.]" *Id.* He requested habeas relief with direction that DHS "provide him a new opportunity to apply for asylum[.]" *Id.* at 115. Importantly, "[h]is petition made no mention of release from custody." *Id.* The district court dismissed petitioner's habeas application for lack of jurisdiction pursuant to 8 U.S.C. §§ 1252(a)(2) and (e)(2), but the Ninth Circuit reversed, holding that such an application of these statutes violated the Suspension Clause. *Id.* Thus, the question before the Supreme Court in *Thuraissigiam* was whether the provisions provided in the INA for limited

12

review in habeas concerning *admission* of arriving aliens violate the Suspension Clause or Fifth Amendment Due Process. *Id.* at 107-08, 111.

In finding that § 1252(e)(2) does not violate the Suspension Clause, the Supreme Court heavily relied upon the fact that Thuraissigiam was not seeking release from custody. *Thuraissigiam*, 591 U.S. at 114-137. In fact, this failure to seek release was pivotal to the Court's decision.[3] *Id.* The Court concluded that § 1252(e) does not violate the Suspension Clause because that provision does not limit habeas as understood at the time of the adoption of Constitution—to allow release from unlawful custody. *Id.* at 117. Habeas, the Court explained, cannot be used as Thuraissigiam was asking to use it, to challenge admission and to gain lawful entry into the United States. *Id.* at 125 ("[W]hile the release of an alien may give the alien the opportunity to remain in the country if the immigration laws permit, we have no evidence that the writ as it was known in 1789 could be used to require that aliens be permitted to remain in a country other than their own, or as a means to seek that permission."). Thus, the Court concluded, § 1252(e)'s limitation on habeas review does not violate the Suspension Clause.

---

[3] The Supreme Court repeatedly emphasized that Thuraissigiam did not ask for release from custody in his application for habeas relief: "His petition made no mention of release from custody[,]" 591 U.S. at 115; "In this case, however, respondent did not ask to be released[,]" *id.* at 117; "Not only did respondent fail to seek release, he does not dispute that confinement during the pendency of expedited asylum review, and even during the additional proceedings he seeks, is lawful[,]" *id.* at 118; "Because respondent seeks to use habeas to obtain something far different from simple release, . . ." *id.* at 120; "Respondent does not seek this sort of conditional release either, because the legality of his detention is not in question[,]" *id.* at 122; "And in all the cited cases concerning aliens detained at entry, unlike the case now before us, what was sought—and the only relief considered—was release[,]" *id.* at 135-35; and contrasting the cases in which detainees in Guantanamo asked to be released from custody, the Court explained that those petitioners "sought only to be released from Guantanamo, not to enter this country[,]" *id.* at 136-37.

The Court also found that the procedures provided by § 1225(b) and § 1252(e) comport with due process regarding Petitioner's credible fear proceeding. In so finding, the Supreme Court relied upon the distinction discussed above between non-citizens present in the United States and those stopped at the border. *Thuraissigiam*, 591 at 138-41. The Court explained that the limited due process provided to aliens seeking admission

> rests on fundamental propositions: [T]he power to admit or exclude aliens is a sovereign prerogative . . . ; the Constitution gives the political department of the government plenary authority to decide which aliens to admit . . . ; and a concomitant of that power is the power to set the procedures to be followed in determining whether an alien should be admitted[.]

*Id.* at 139 (internal quotation marks and citations omitted). Thus, "[w]hen an alien arrives at a port of entry—for example, an international airport—the alien is on U.S. soil, but the alien is not considered to have entered the country for purpose of this rule." *Id.*

Courts have named this concept the "entry fiction." Under this rule, "an applicant for admission to the country is treated as if he were stopped at the border for the purposes of his application for admission." *Al-Thuraya v. Warden*, -- F. Supp. 3d --, 2025 WL 2858422, at *3 (S.D.N.Y. Oct. 9, 2025). "In other words, while a person seeking legal entry into the United States may be granted *physical* entry into the country pending the determination of his application for admission, the mere fact of his physical presence within our borders provides him no greater constitutional protection *as to his application* than if he were outside the country. *Id.* (emphasis in

14

original) (citing *Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958)).[4]  The Supreme

Court in *Thuraissigiam* again recognized the entry fiction and found that, for

purposes of whether an arriving alien can be admitted to the United States,

Thuraissigiam has only the rights provided by statute: "Because the Due Process

Clause provides nothing more, it does not require review of [the determination

whether petitioner had a significant possibility of establishing eligibility for asylum]

or how [that determination] was made.  As applied here, therefore, § 1252(e) does not

violate due process." *Thuraissigiam*, 591 U.S. at 140.

> 3.     *Similarly, the entry fiction does not apply to issues of detention.*

This holding in *Thuraissigiam* was not new ground regarding the entry fiction,

the right to habeas relief, or the limitations of due process.  So, it does not necessarily

follow, and neither the Supreme Court nor the Eleventh Circuit have held, that the

entry fiction applies to claims for release from detention such as those asserted by

---

[4] In *Leng May Ma*, the Supreme Court held that parole of an individual into the United States during the pendency of that person's immigration proceedings does not constitute presence "within the United States" for purposes of the rights that attach during those proceedings or eligibility for certain types of relief.  *See generally, Leng May Ma*, 357 U.S. 185.  At the time, individuals present in the United States were subject to expulsion as opposed to those stopped at the border and subject to exclusion.  *Id.* at 188.  The Court concluded:

> The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted. It was never intended to affect an alien's status, and to hold that petitioner's parole placed her legally 'within the United States' is inconsistent with the congressional mandate, the administrative concept of parole, and the decisions of this Court.  Physical detention of aliens is now the exception, not the rule, and is generally employed only as to security risks or those likely to abscond. (citations omitted).  Certainly this policy reflects the humane qualities of an enlightened civilization.  The acceptance of petitioner's position in this case, however, with its inherent suggestion of an altered parole status, would be quite likely to prompt some curtailment of current parole policy—an intention we are reluctant to impute to the Congress.

*Id.* at 190.

Petitioner here.  The Fifth Amendment states that "no person" shall be "deprived of life, liberty, or property without due process of law[.]"  And "all persons within the territory of the United States are entitled to the protection guaranteed by [that] amendment." *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (finding that the fifth and sixth amendments apply to aliens within the territory of the United States such that they cannot be subject to detention with hard labor without presentment to a grand jury and due process).  Clearly Petitioner is physically present in the United States.  And even the entry fiction cases allow for some level of due process for individuals considered stopped at the border.[5]  Thus, the Court finds that neither *Thuraissigiam* nor the entry fiction prohibit an arriving alien from asserting a claim for a violation of Fifth Amendment due process based on prolonged mandatory detention under 8 U.S.C. § 1225.

> 4.      *Arriving aliens' due process rights regarding detention.*

This Court thus joins the majority of courts around the country in finding that mandatory detention pursuant to § 1225(b)(1) without a bond hearing will, at some point, become unreasonable and violate due process.  *See, e.g., Sadeqi v. Larose*, -- F.

---

[5] Assuming the entry fiction did apply to Petitioner, the Court finds that the procedures, or lack thereof, provided in the INA regarding detention for arriving aliens are constitutionally inadequate. Unlike the process described in *Thuraissigiam* regarding admission where the non-citizen "has an opportunity at three levels to obtain an asylum hearing[]" and which the Supreme Court found to be constitutionally adequate, 591 U.S. at 110, 138-41, the process regarding detention has no review.  In fact, there is no process for an arriving alien in expedited removal proceedings to receive an individualized determination regarding detention based on flight risk or dangerousness.  The fact that non-citizens can request parole for humanitarian reasons does not change this analysis.  The parole process "has highly restrictive criteria and limited transparency, is subject to the unreviewable discretion of the Attorney General, and has no opportunity for an actual hearing before a neutral decisionmaker." *Mbalvito v. Holt*, 527 F. Supp. 3d. 838, 848 (E.D. Va. 2020) (finding that "the statutory parole remedy available to Petitioner is not constitutionally adequate").

Supp. 3d --, 2025 WL 3154520, at *2 (S.D. Cal. Nov. 12, 2025) ("This Court agrees with the majority position that a petitioner detained under Section 1225(b)(1) may assert a due process challenge to prolonged mandatory detention without a bond hearing."); *Fils-Aime v. FCI Berlin, Warden*, -- F. Supp. 3d --, 2025 WL 3063164, at *3 (D.N.H. Oct. 31, 2025) (explaining that the court "joins the several district and circuit courts that have suggested and held that prolonged mandatory detention pending removal proceedings, without a bond hearing, will at some point violate the right to due process."); *Al-Thuraya*, 2025 WL 2858422, at *5 ("[I]t's unsurprising that the vast majority of courts to address whether individuals detained under § 1225(b) have a right to a bond hearing have held that they do." (collecting cases)); *A.L. v. Oddo*, 761 F. Supp. 3d 822, 825-26 (W.D. Penn. 2025) ("Accordingly, this Court finds that an arriving alien . . . has a constitutional due process right to a bond hearing once his detention becomes unreasonable to the same extent as an alien who is subject to removal under § 1226(c)."); *Leke v. Hott*, 521 F. Supp. 3d 597, (E.D. Va. 2021) ("[O]nly a moment's reflection is needed to confirm that the Fifth Amendment applies to arriving aliens in this respect."); *Kydyrali v. Wolf*, 499 F. Supp. 3d 768, 772 (S.D. Cal. 2020) ("Accordingly, . . . the Court joins the majority of courts across the country in concluding that an unreasonably prolonged detention under 8 U.S.C. § 1225(b) without an individualized bond hearing violates due process."); *Mbalivoto v. Holt*, 527 F. Supp. 3d 838, 850 (E.D. Va. 2020) ("[T]he Court joins those other courts that have concluded that an individualized bond hearing is required at that point when an entering alien's continued detention under 8 U.S.C. § 1225(b) becomes unreasonable

17

and constitutionally infirm without one."); *see also Abdul-Samed v. Warden of Golden State Annex Det. Facility*, No. 1:25-cv-98, 2025 WL 2099343, at *6 (E.D. Cal. Aug. 14, 2025) ("[T]he Court finds that unreasonably prolonged detention without an individualized bond hearing violates due process."); *Arechiga v. Archambeault*, No. 2:23-cv-600, 2023 WL 5207589, at *4 (D. Nev. Aug. 11, 2023) (finding that arriving alien detained under § 1225(b)(1) was entitled to a bond hearing); *Hong v. Mayorkas*, No. 20-cv-01784, 2022 WL 1078627, at *3 (W.D. Wash. Apr. 11, 2022) (finding that mandatory detention without a bond hearing pending removal will, at some point, violate due process).

### C.    Prolonged Detention under § 1225(b)(1)

#### 1.    *Reasonableness Test*

Having found that Fifth Amendment procedural due process applies to arriving aliens' detention, the Court next turns to the appropriate test to determine whether a petitioner's detention is prolonged such that he is entitled to a bond hearing. First, in evaluating the proper test, the Court keeps in mind the principles of immigration law discussed above. Second, the Court again recognizes that there is no binding authority on this issue. However, Petitioner cites to the Eleventh Circuit's decision in *Sopo v. U.S. Attorney General*, 825 F.3d 1199 (11th Cir. 2016), *vacated as moot,* 890 F.3d 952 (11th Cir. 2018),[6] as providing guidance for how this court should approach this issue.

---

[6] *Sopo* was vacated as moot post-*Jennings* after Sopo was removed from the United States. Prior to that ruling, the Eleventh Circuit directed the parties to "file supplemental briefing addressing [*Jennings'*] impact on [the decision in *Sopo*]." 890 F.3d at 953. Because of Sopo's removal, that briefing

In *Sopo*, the Eleventh Circuit construed a different mandatory detention provision—8 U.S.C. § 1226(c)—"to contain an implicit temporal limitation" requiring that the government provide "an individualized bond hearing to detained criminal aliens whose removal proceedings have become unreasonably prolonged." *Sopo*, 825 F.3d at 1214. The court explained that in evaluating whether a bond hearing is necessary, courts "must consult the record and balance the government's interest in continued detention against the criminal alien's liberty interest, always seeking to determine whether the alien's liberty interest has begun to outweigh 'any justification for using presumptions to detain him without bond.'" *Id.* at 1218-19 (quoting *Chavez-Alvarez v. Warden York Cnty. Prison*, 783 F.3d 469, 478 (3d Cir. 2015)). Under the *Sopo* rule, a court considers the following non-exhaustive factors in balancing these interests: (1) the amount of time the alien has been in civil detention without a bond hearing; (2) the reason(s) for the protracted removal proceedings;

> (3) whether it will be possible to remove the criminal alien after there is a final order of removal; (4) whether the alien's civil immigration detention exceeds the time the alien spent in prison for the crime that rendered him removable; and (5) whether the facility for the civil immigration detention is meaningfully different from a penal institution for criminal detention.

*Id.* at 1218.

In coming to the conclusion that due process limits the time during which an individual can be subjected to mandatory detention, the Eleventh Circuit emphasized the reasoning of the Supreme Court in both *Zadvydas* and *Demore v. Kim*, 538 U.S.

---

was never completed and the Eleventh Circuit failed to have an opportunity to analyze *Jennings'* impact on its prior holding. *Id.*

510 (2003). As explained above, in *Zadvydas*, the Court found that a statute which allows for the indefinite detention of a non-citizen "'would raise a serious constitutional problem' under the Fifth Amendment's Due Process Clause[.]" *Sopo*, 825 F.3d at 1210 (quoting *Zadvydas*, 533 U.S. at 682). The Eleventh Circuit acknowledged this limit on civil detention: "Under the Due Process Clause, *civil detention* is permissible only when there is a 'special justification' that 'outweighs the individual's constitutionally protected interest in avoiding physical restraint.'" *Id.* at 1210 (emphasis in original) (quoting *Zadvydas*, 533 U.S. at 690). Thus, an individual could seek "habeas relief after the criminal alien's detention exceeded the 'period reasonably necessary to secure removal.'" *Id.* (quoting *Zadvydas,* 533 U.S. at 682).

The Eleventh Circuit then turned its discussion to the Supreme Court's decision in *Demore*—in which the Court found 8 U.S.C. § 1226(c) to be facially constitutional. *See Sopo*, 825 F.3d at 1210-12. *Demore* concerned different considerations because the detention at issue in *Demore* had a natural end point, the conclusion of removal proceedings, as opposed to the "'potentially permanent' detention period at issue in *Zadvydas*[.]" *Id.* at 1210-11 (quoting *Zadvydas*, 533 U.S. at 528-29). As the Eleventh Circuit explained, the Supreme Court focused on two important factors. First, "the Supreme Court emphasized that the purpose of mandatory detention in § 1226(c) is to prevent deportable criminal aliens from absconding and from committing more crimes before they are removed." *Id.* at 1211 (citing *Demore*, 538 U.S. at 518-20). Thus, continued detention of the petitioner in *Demore* under § 1226(c) "still served Congress's purposes, because it ensured that he

20

would come to his removal proceedings instead of remain at large where he could commit more crimes." *Id.* (citing *Demore*, 538 U.S. at 518, 527-28). Second, the Supreme Court "stressed" the relatively short period of detention under § 1226(c)[7] and found that that "limited period of time" is "materially different from the indefinite detention discussed in *Zadvydas.*" *Sopo*, 825 F.3d at 1211 (citing *Demore*, 538 U.S. at 528). The Eleventh Circuit found these two factors to be "critical observations" that resulted in the Supreme Court's conclusion that "'Congress . . . may require that persons . . . be detained for the *brief period necessary for their removal proceedings,*' without the opportunity to argue for bond." *Id.* at 1211 (emphasis in original) (quoting *Demore*, 538 U.S. at 513). Thus, the Eleventh Circuit concluded, "[w]hile *Demore* upheld § 1226(c)'s provision mandating detention of criminal aliens during removal proceedings, it did so with a strong constitutional caveat about due process concerns as to continued mandatory detention where the duration of the removal proceedings is unreasonably long or delayed." *Id.* at 1212. The court then created the reasonableness test discussed above which would require a case-by-case analysis because "'[r]easonableness, by its very nature, is a fact-dependent inquiry requiring an assessment of all of the circumstances of any given case.'" *Sopo*, 825 F.3d at 1215 (quoting *Diop v. ICE/Homeland Sec.,* 656 F.3d 221, 234 (3d Cir. 2011)).

These due process considerations, discussed by the Eleventh Circuit and the Supreme Court, did not change based on any subsequent decision by the Supreme

---

[7] "In sum, the detention at stake under § 1226(c) lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal." *Demore*, 538 U.S. at 530.

Court, including *Jennings*. Thus, the Court agrees with Petitioner that *Sopo* outlines the due process concerns inherent in mandatory detention and that the test provided by the Eleventh Circuit is an appropriate starting place.

However, the Court recognizes that the *Sopo* test specifically relates to criminal aliens, something not relevant to individuals detained under § 1225(b)(1). The fourth factor outlined by *Sopo*, "whether the alien's civil immigration detention exceeds the time the alien spent in prison for the crime that rendered him removable[,"] should thus not be included in the reasonableness test for noncitizens detained under § 1225(b)(1). Further, immigration detention in this division of the Middle District of Georgia occurs at only one detention facility—Stewart Detention Center—the same detention center at which Sopo was detained. The Eleventh Circuit described Stewart as a "prison-like facility" and weighed this factor against the government. *Sopo*, 825 F.3d at 1221. For purposes of evaluating future petitions, the Court will thus assume that this provision weighs against the government if an individual is detained at Stewart.

Thus, if the Court were to rely exclusively on *Sopo,* the Court would look at the following factors to determine whether Petitioner's detention has become unreasonable: (1) the amount of time in immigration detention without a bond hearing; (2) the reason(s) for the protracted removal proceedings; (3) whether it will be possible to remove the noncitizen after there is a final order of removal; and (4) whether the immigration detention facility is meaningfully different from a prison used for criminal detention. However, the Court finds that further modifications to

22

the test in *Sopo* are appropriate for an individual claiming prolonged detention under § 1225(b)(1). *See Sopo*, 825 F.3d at 1218 ("Our list of factors is not exhaustive. The reasonableness inquiry is necessarily fact intensive, and the factors that should be considered will vary depending on the individual circumstances present in each case.").

Other district courts that use a multi-factor reasonableness test use various versions of the factors listed above.[8] Some courts separate *Sopo* factor two into separate factors—(1) the delays caused by the government, and (2) the delays caused by the petitioner. *See, e.g., Sadeqi,* 2025 WL 3154520, at \*3. Additionally, multiple courts also consider the likely duration of future detention. *See, e.g., id.*; *Fils-Aime*, 2025 WL 3063164, at \*5; *A.L.*, 761 F. Supp. 3d at 825. Finally, in looking at the third factor, some courts use a modified version of that factor and instead look at whether the proceedings are likely to result in a final order of removal. *Sadeqi*, 2025 WL 3154520, at \*3. The Court agrees that these additional factors are relevant in determining the reasonableness of a petitioner's continued detention. Consequently the Court concludes that it reviews the following factors to determine whether Petitioner's detention has become unreasonable such that he is entitled to a bond hearing: (1) the amount of time in immigration detention without a bond hearing;

---

[8] Some Courts use the multi-factor test as outlined in *Mathews v. Eldridge,* 424 U.S. 319 (1976) to determine reasonableness. Under *Mathews*, a court evaluates the following factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335.

23

(2) the likely duration of future detention; (3) delays in the proceedings caused by the government; (4) delays in the proceedings caused by the petitioner; (5) whether the proceedings are likely to result in a final order of removal and, if so, likely removability; and (6) whether the immigration detention facility is meaningfully different from a prison used for criminal detention.

### 2.   *Weighing the Factors*

As explained in more detail directly below, these factors weigh heavily in Petitioner's favor in this case.

#### a.   Amount of Time in Immigration Detention

Petitioner came into immigration custody on November 3, 2023.  Gloster Decl. ¶¶ 4-5.  Thus, as of the filing of this recommendation, he has been detained for approximately 830 days, or over two years and three months, without a bond hearing. In *Sopo*, the Eleventh Circuit concluded that "[t]he need for a bond inquiry is likely to arise in the six-month to one-year window," and that the "one-year mark" without a bond hearing is the "outer limit of reasonableness[.]"  825 F.3d at 1217.  Petitioner's detention without a bond hearing is well-beyond the outer limit of reasonableness that the Eleventh Circuit described.  This factor thus weighs heavily in favor of Petitioner.

#### b.   Likely Duration of Future Detention

Although the Court cannot predict the future length of Petitioner's detention with any specificity, it does recognize the current and future status of Petitioner's case.  Specifically, Petitioner has been denied relief by the immigration judge and

ordered removed to Kyrgyzstan. He appealed that decision to the BIA in July 2025 and briefing completed in October 2025. Resp'ts' Status Rep. 2. He has also indicated an intent to appeal the BIA's decision to the appropriate court of appeals if he is not successful in his appeal at the BIA. Pet'r's Status Rep. 2. Each of these periods will likely result in many additional months, if not years, of detention for Petitioner.

Concerning the time pending with the BIA, the Court assumes the BIA will address Petitioner's appeal in due course, but takes judicial notice of the huge increase in appeals filed in fiscal year 2025 and the current backlog of pending appeals. Exec. Off. for Immigr. Rev., Adjudication Statistics, Nov. 18, 2025, www.justice.gov/eoir/media/1344986/dl?inline (on file with the Court). In fiscal year 2025, the number of appeals increased from 50,427 (FY2024) to 99,589, but the number of appeals completed decreased from 44,785 (FY2024) to 35,362. *Id.* Consequently, at the end of FY2025, the BIA had a pending appeal backlog of over 200,000 cases. *Id.* It is thus no surprise to the Court that Petitioner's appeal, filed in July 2025, is still pending. This factor weighs in Petitioner's favor.

c.      Delays in the Proceedings Caused by the Government

As discussed above, the immigration proceedings in this case have been lengthy—over two years. In part, the prolonged nature of Petitioner's proceedings are the result of delays from the parties and immigration court. The proceedings occurred as follows: Petitioner came into immigration custody on November 3, 2023, and expressed fear at that time. Gloster Decl. Attach. A, at 2. Petitioner was not provided a credible fear interview until almost two months later on December 29,

2023.  Gloster Decl. ¶ 5.  ICE then failed to issue Petitioner's NTA until another month and a half later on February 14, 2024.  Gloster Decl. ¶ 7 & Attach. C.  On March 21, 2024, Petitioner had an initial master calendar hearing which was rescheduled because no interpreter was provided by the court.  Gloster Decl. ¶ 9.  Similarly, on April 2, 2024, Petitioner's hearing had to be moved to April 9, 2024, because the interpreter was unavailable.  *Id.* ¶ 10.  Petitioner then moved for a continuance on April 9, 2024, to retain counsel, but retained counsel by April 13, 2024.  Gloster Decl. ¶¶ 11-12.  Petitioner admitted the allegations in the NTA on May 17, 2024, and submitted applications for relief on June 4, 2024.  *Id.* ¶¶ 17-18.  Petitioner's merits hearing was scheduled for September 3, 2024, but Petitioner's counsel failed to appear in person.  Taskin Decl. ¶ 5, ECF No. 16-1.  Consequently, Petitioner's merits hearing was rescheduled for December 19, 2024, but it could not proceed because of an internet outage.  *Id.* ¶ 22; Taskin Decl. ¶ 5.  The immigration court then rescheduled Petitioner's hearing for almost four months later on April 10, 2025.  Gloster Decl. ¶ 22; Taskin Decl. ¶ 5.  Before that hearing could be held, ICE moved Petitioner to a detention center in Texas.[9]  Gonzales Decl. ¶ 4; Taskin Decl. ¶ 6.  As a result of Petitioner's transfer, his hearing was moved to May 12, 2025, but was set again as a master calendar hearing instead of a merits hearing.  Gonzales Decl. ¶ 5.  Petitioner moved to vacate the master hearing and instead set Petitioner's case for a

---

[9] Neither party contends that this transfer strips the district court of jurisdiction to rule on this habeas petition, and rightfully so.  As the Supreme Court has explained, "when the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release." *Rumsfeld v. Padilla*, 542 U.S. 426, 441 (2004).

merits hearing.  *Id.* ¶ 6.  The immigration court granted Petitioner's request and set his merits hearing for May 23, 2025.  *Id.*  Petitioner's merits hearing went forward as scheduled on May 23, 2025.  The parties timely submitted closing briefs, and the immigration judge issued his decision denying relief on July 1, 2025.  Gonzales Decl. ¶¶ 7-8.  Petitioner appealed the immigration judge's decision on July 4, 2025, and the parties timely submitted their appellate briefs in October 2025.  *Id.* ¶¶ 8-9.  It is unclear from the record why the briefs for the BIA were not due until mid-to-late October—an over three-month delay.  That appeal remains pending four months after briefing and seven months after filing.

Respondents contend that there are no delays that can be attributed to ICE and asks this Court to decline to attribute any delays caused by the immigration court to Respondents.  Resp'ts' Resp. 17-18.  However, that is not the test outlined by the Eleventh Circuit in *Sopo*.  The Eleventh Circuit advised courts to examine the record to determine "whether the government or the [alien] have failed to participate actively in the removal proceedings or sought continuances and filing extensions that delayed the case's progress."  825 F.3d at 1218.  Further, "[e]rrors by the immigration court or the BIA that cause unnecessary delay are also relevant."  *Id.*

The Court thus looks at the record as a whole to determine whether the government caused any delays in the proceedings.  Respondents are responsible for the delay in providing Petitioner with a credible fear interview and with failing to promptly file an NTA.  After these relatively minor delays (approximately 3.5 months) considering the length of Petitioner's detention, Respondents did not cause

27

further delay in Petitioner's case except for the month delay regarding Petitioner's transfer to Texas. In all, Respondents are responsible for approximately 4.5 months of delay.

Instead, it appears that much of the cause of Petitioner's protracted proceedings lies with delays in the immigration court. Considering the discussion above, and not accounting for some delays (such as the time between filing the BIA appeal in July and the date the briefs were filed), the immigration court is responsible for almost nine months of delay in Petitioner's proceedings. Respondents would not have the Court count these additional delays against them. And the Court agrees that many of these delays are based on the current backlogged immigration court system; thus, the Court declines to weigh much of this delay against Respondents. However, there are some delays that were caused by errors of the immigration court—not errors in rulings, but other errors such as the failure to obtain an interpreter and the failure to have internet access—that the Court does consider as governmental errors that should weigh in favor of Petitioners and against Respondents. Those delays total approximately 4 months. Thus, in total, the Court attributes 8.5 months of delay to Respondents; this factor weighs for Petitioner.

d.    Delays in the Proceedings Caused by the Petitioner

In looking at this factor, the Court should not punish a noncitizen "for pursuing avenues of relief and appeals[,]" but should determine "whether the alien sought repeated or unnecessary continuances, or filed frivolous claims and appeals." *Sopo*, 825 F.3d at 1218. Further, "[e]vidence that the alien acted in bad faith or sought to

28

deliberately slow the proceedings in hopes of obtaining release cuts against the alien." *Id.*

Petitioner is responsible for limited delays in his case. Petitioner moved for a continuance on April 9, 2024, to retain counsel, which resulted in a small, 10-day delay. Gloster Decl. ¶¶ 11-12; Resp'ts' Resp. 18. Further, Petitioner's counsel failed to appear in person for a hearing on September 3, 2024, which resulted in an approximately three-and-a-half-month delay. In total, the Court attributes approximately 4 months of the delay to Petitioner. This factor weighs slightly for Respondents.

   e.  Whether Proceedings Will Likely Result in a Final Order of Removal and Whether Petitioner Will be Removable

In order to weigh this factor, the Court looks to the current posture of the case and determinations already made regarding Petitioner's removability. An asylum officer found that Petitioner had a credible fear of removal to Kyrgyzstan, Gloster Decl. ¶ 5, but the IJ denied Petitioner's request for relief and found him removable to Kyrgyzstan. Gonzales Decl. ¶ 8. Despite the denial of relief, Petitioner maintains that he has a "strong" claim for relief from removal. Pet. 20. However, if Petitioner is ordered removed and he is unsuccessful in his appeals, the parties agree that there should be no impediment to his removal to Kyrgyzstan. Pet. 21; Resp'ts' Resp. 18. Taking this information as a whole, this factor weighs in favor of Respondents.

   f.  Conditions of Confinement

This factor looks at whether the Petitioner is being held in a facility that is "prison-like". *Sopo,* 825 F.3d at 1221. Respondents conceded this factor in their

response as related to Petitioner's detention at Stewart Detention Center.  Resp'ts' Resp. 16.  Petitioner, however, has been detained at two other detention facilities— Port Isabel Service Processing Center and South Texas ICE Processing Center ("STIPC").  The Court finds that each of these facilities are prison-like.  *See* Pet. ¶ 59 & n.9.[10]  This factor thus weighs against Respondents.

In summary, four of the six factors weigh in Petitioner's favor.  And the first factor, the length of detention, weighs heavily in Petitioner's favor given that Petitioner has been detained for over two years without a bond hearing.  The Court thus finds that Petitioner's detention has become prolonged in violation of due process such that he is entitled to a bond hearing.

In making this determination, the Court considered the government's interest in enforcing immigration laws and the executive branch's authority in controlling admission at the border.  The specific issue in this case, however, is the government's interest in continuing to detain an individual like Petitioner without a bond hearing, and at this point, the Court finds that interest to be low.  *See, e.g., Abdul-Samed*, 2025 WL 2099343, at \*8 ("However, the government interest at stake here is not the continued detention of Petitioner, but the government's ability to detain him *without*

---

[10] Neither party submitted evidence concerning the conditions at the South Texas ICE Processing Center since Petitioner was not housed there when the Petition was originally filed.  However, the Court notes that STIPC appears to be a standard detention facility run by The Geo Group, to include the following prison-like qualities: having fences, barbed wire, limited forms of communication, and shared eating and hygiene facilities.  *See,* South Texas ICE Processing Center, The Geo Group, Inc., https://www.geogroup.com/facilities/south-texas-ice-processing-center/ (last visited Feb. 12, 2026); South Texas ICE Processing Center; U.S. Immigr. & Customs Enf't, https://www.ice.gov/detain/detention-facilities/south-texas-ice-processing-center (last visited Feb. 12, 2026); *cf. Toure v. Huron*, No. SA-20-CV-1036, 2021 WL 75698, at \*4, (W.D. Tex. Jan. 8, 2021) (discussing facility conditions as "typical detention-facility conditions" in context of claim for release due to COVID).

*a bond hearing.*" (internal quotation marks and citation omitted) (emphasis in original)).  This contrasts with Petitioner's fundamental liberty interest to be free from governmental detention.  *See, e.g., Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects.").  That fundamental right must control here; Petitioner is entitled to a bond hearing.

### 3.    *Petitioner's Bond Hearing*

Petitioner requests a bond hearing at which the burden is placed on the government to prove dangerousness and flight risk.  Pet. 37.  Neither the Eleventh Circuit nor this Court has ever held that a bond hearing based on prolonged detention must comply with more rigorous requirements than those outlined in the INA at 8 U.S.C. § 1226(a) and the immigration regulations at 8 C.F.R. § 1236.1.[11]  *Sopo*, 825 F.3d at 1219-20; *see also, e.g., J.N.C.G. v. Warden,* No. 4:20-cv-62, 2020 WL 5046870, at *7 (M.D. Ga. Aug. 26, 2020).  The Court declines again to veer from those prior rulings.  Petitioner's application for habeas relief should be granted and he should be provided an individualized bond hearing with an immigration judge that complies with the requirements of 8 C.F.R. § 1236.1(c) and (d).

---

[11] The Court recognizes the decision in *J.G. v. Warden,* 501 F. Supp. 3d 1331 (M.D. Ga. 2020), in which the petitioner claimed that his detention under 8 U.S.C. § 1226(a) violated due process because he had not had a bond hearing at which the government had to bear the burden of proof.  501 F. Supp. 3d at 1333.  The court concluded that the petitioner's "incarceration—without the Government showing any evidence to justify it—violated [p]etitioner's right to due process of law."  *Id.* at 1340-41.  As a remedy for this violation, the court "order[ed] a second bond hearing with the burden of proof placed on the Government."  *Id.* at 1341. However, the Court declines to extend the rationale of *J.G.* to a case like this, in which an individual is detained based on a mandatory detention provision. *Cf. O.D. v. Warden*, No. 4:20-cv-222, 2021 WL 5413968, at *5 (M.D. Ga. 2021)

31

## II.    Parole Claims and Respondents' Motion to Dismiss

Petitioner also seeks relief related to his parole denials.  Specifically, Petitioner claims that Respondents' failure to comply with ICE Directive 11002.1—Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (hereinafter "Parole Directive")[12] violates due process and the APA.  Respondents move to dismiss these claims as moot because Petitioner received a parole redetermination as provided for in the Parole Directive.[13]  Mot. to Dismiss in Part 1-4, ECF No. 15. Petitioner responds that the motion should be denied because, after the parole interview, Respondents failed to make a particularized determination regarding Petitioner's request for parole.  Pet'r's Resp. Mot. Dismiss 2-4, ECF No. 16.  As explained below, it is recommended that Respondents' motion to dismiss Petitioner's parole-related claims be granted.

### A.    The Parole Directive and Petitioner's Claims

Petitioner contends ICE failed to follow its own policies concerning parole as set forth in Parole Directive.  The directive "provides guidance to Detention and Removal Operations (DRO) Field Office personnel for exercising their discretion to consider the parole of arriving aliens . . . who have been found to have a 'credible fear' of persecution or torture."  Parole Directive ¶ 1.  The Parole Directive states, *inter*

---

[12] The Parole Directive is attached to the Petition as Exhibit I at ECF No. 1-15.

[13] In their response, Respondents also claim that Petitioner's claims regarding the Parole Directive are not cognizable in habeas and that the Court lacks jurisdiction to consider a challenge to a parole denial.  Resp'ts' Resp. 22-30.  The Court rejects Respondents' jurisdictional argument under 8 U.S.C. § 1252 because Petitioner is not asking for a review of the parole decision itself; instead, Petitioner asks that the Court review the procedures used by Respondents in denying his requests for parole. Additionally, because the Court recommends granting Respondents' motion to dismiss, it declines to address Respondents' other argument and assumes that Petitioner's claims can be asserted in habeas.

*alia*, that "when an arriving alien found to have a credible fear establishes . . . his or her identity and that he or she presents neither a flight risk nor danger to the community, ERO should, absent additional factors[,] . . . parole the alien." *Id.* at ¶ 6.2.

In his Petition, Petitioner claims Respondents violated the Parole Directive in the following ways: (1) by failing to provide Petitioner with a Parole Advisal and Scheduling Notification and explaining the notification; (2) by failing to conduct a parole interview; (3) by failing to provide Petitioner or his counsel with a letter explaining the parole denial and right to seek redetermination; and (4) by failing to "conduct an individualized determination on whether [Petitioner] warrants parole[.]" Pet. ¶ 74. As a remedy for these violations, Petitioner asks the Court to either conduct a parole redetermination following these procedures or to order Respondents to conduct a parole redetermination following these procedures. Pet. 37.

After Petitioner filed this case, Respondents provided Petitioner with a parole redetermination. The parties agree that during the parole redetermination process, Respondents complied with the requirements of the Parole Directive in that they provided Petitioner with a Parole Advisal and Scheduling Notification, they explained the notification, and they conducted a parole interview. Pet'r's Resp. to Mot. to Dismiss 2-3; *see also* Taskin Decl. ¶ 3 ("It was not until January 2025 that ICE served [Petitioner] with a Parole Advisal, interviewed him, and provided a Notification Declining to Grant Parole[.]"). Petitioner maintains, however, that Respondents failed to conduct an individualized assessment of whether Petitioner is

33

entitled to parole and failed to provide explanation for the reasons denying parole. *Id.*; *see also* Parole Directive ¶ 8.2.

In support, Petitioner cites to the Notification Declining to Grant Parole. 2d Gloster Decl. Attach. B., ECF No. 15-3.  The Notification Declining to Grant Parole is a standard form with boxes that can be checked which provide reasons for declining to grant parole.  *Id.*  For Petitioner, Respondents checked the box that indicates that Petitioner failed to establish to "ICE's satisfaction" that he is "not a danger to the community or U.S. security."  *Id.* at 2.  Because Respondents merely checked the box on this standard form, Petitioner contends that Respondents failed to comply with the Parole Directive.

B.    Respondents' Motion to Dismiss Should be Granted

As explained directly above, Petitioner argues that because Respondents checked a box indicating he does not constitute a flight risk, Respondents violated the policy set forth in the Parole Directive.[14]  But the evidence in the record shows the following: On January 14, 2025, Petitioner was served with the Parole Advisal and was provided an explanation of the information contained therein.  2d Gloster Decl. ¶ 4 & Attach. A, ECF Nos. 15-1, 15-2.  The Parole Advisal form provides a list of documents a noncitizen can use to prove identity, that he is  not a flight risk, and that he is  not a danger.  *Id.* Attach. A.  On January 20, 2025, Petitioner, with the

---

[14] In support of this argument, Petitioner cites primarily to three decisions from the United States District Court for the District of Columbia.  These nonbinding decisions deal with the notice given to a petitioner upon a parole denial.  And while they do generally disfavor the use of boilerplate denials, the discussion of that boilerplate language is not in the holding of any of those cases and is instead merely included in dicta.  The Court consequently declines to construe these mentions of "boilerplate" language in parole denials in the way desired by Petitioner at this time.

34

assistance of counsel, provided evidence to Respondents to support his request for parole. 2d Gloster Decl. ¶ 5. The following day, January 21, 2025, Respondents conducted their parole interview with Petitioner. *Id.* ¶ 6. Regarding the decision to deny parole, Deportation Officer Michael Gloster declared as follows:

> On January 23, 2025, ICE/ERO considered the parole interview and evidence Petitioner submitted in assessing whether Petitioner should be paroled. Ultimately, Petitioner's parole request was denied because he had not established that he was not a danger to the community or U.S. security, and he was served notice of the denial.

2d Gloster Decl. ¶ 7. Petitioner then received the parole denial notification which selects a box which states:

> You have not established to ICE's satisfaction that you are not a danger to the community or U.S. security. In making this determination, ICE has taken into account any evidence of past criminal activity, activity contrary to U.S. national security interests, activity giving rise to concerns of public safety or danger to the community, disciplinary infractions or incidents, or other criminal or detention history that show you have harmed or would likely harm yourself or others.

2d Gloster Decl. Attach. B at 2.

Petitioner fails to provide any rebuttal evidence to the sworn declaration by DO Gloster and attached exhibits. Instead, Petitioner argues that the checking of a box on the parole denial notification *necessarily* means that Respondents neither made an individualized assessment nor provided him with reasons for his parole denial. The Court declines to make such a finding here.

The Court finds that the evidence submitted shows that ICE/ERO considered the evidence submitted by Petitioner, considered his interview, and made an individualized assessment regarding his parole. The Court also finds that the parole

notification letter provided by Respondents is sufficient to comply with the Parole Directive's requirement at paragraph 8.2 that a noncitizen be provided a "brief explanation of the reasons for denying parole[.]"  Consequently, Petitioner has received the relief requested in his parole related claims and those claims are now moot.  *See, e.g., Soliman v. United States*, 296 F.3d 1237, 1242 (11th Cir. 2002) ("Therefore, '[i]f events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed.'" (quoting *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001)).  Respondents' motion to dismiss (ECF No. 15) Petitioner's parole related claims should be granted.

## CONCLUSION

For the reasons explained above, the Court recommends that Petitioner's request for a writ of habeas corpus (ECF No. 1) be granted in that he be provided a bond hearing within seven days of the date of adoption of this recommendation.  It is further recommended that Respondents' motion to dismiss in part (ECF No. 15) be granted and that Petitioner's claims regarding parole be dismissed.  Pursuant to 28 U.S.C. § 636(b)(1), Plaintiff may serve and file written objections to this Recommendation, or seek an extension of time to file objections, within fourteen (14) days after being served with a copy hereof.  Any objection should be no longer than TWENTY (20) PAGES in length.  See M.D. Ga. L.R. 7.4.  The district judge shall make a de novo determination of those portions of the Recommendation to which

36

objection is made.  All other portions of the Recommendation may be reviewed for clear error.

Plaintiff is hereby notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object.  In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

**SO RECOMMENDED**, this 13th day of February, 2026.

s/ *Amelia G. Helmick*
UNITED STATES MAGISTRATE JUDGE